Rodriguez v. Dr. Guzman, 21-2841. Welcome back. Thank you. Thank you, Your Honor. Thank you, Judge Loyer. My name is Mateo Gaudi of Paul Weiss, and I represent Appellant Jose Rodriguez. May it please the Court. In entering summary judgment against Mr. Rodriguez on his Section 1983 claims, the District Court repeatedly weighed the evidence and consistently drew inferences in favor of the defendants. This Court should vacate and remand. After almost 11 years, while incarcerated in a New York State prison on a nonviolent offense, Mr. Rodriguez suffered a debilitating stroke that left him partially paralyzed and in a wheelchair. Mr. Rodriguez has now presented evidence that it was the defendant's deliberate indifference that led to his stroke. What is that evidence? There's two buckets of evidence, Your Honor. One is the medical records and the testimony of the medical defendants, and the other is Mr. Rodriguez's own testimony that he was repeatedly denied care because no interpreter was available during medical visits. And if I may start from the medical evidence, unless Your Honor has questions on the interpreter issue first. On the medical evidence, the evidence showed that an inference of deliberate indifference on the subjective prong of that test was justified for at least three reasons. First, the defendants knew and consistently noted in Appellant's medical records that he had a series of pre-stroke symptoms. Defendants knew that those symptoms, as they testified- Well, tell me about those symptoms because I think, but perhaps I'm wrong, I'm focused on the blood pressure. Is that one of the symptoms? That's one of them, yes, Your Honor. And what was the highest blood pressure? The highest blood pressure that is within the relevant, like there was a reading of about 160 over 90 a couple of years before the events, but the highest one was also the latest one and the closest one to the stroke, which was 149 over 86, and that's a JA515. So defendants knew that over a period of seven months, Jose Rodriguez's blood pressure was consistently elevated, as they noted themselves in the record. They wrote at JA473 and again at JA514 to 516 that the blood pressure- That certainly indicates that measures should be taken, but they were. It was an EKG and he was given access to a blood pressure monitor at any time, so if he had felt fibrillations or whatever it is people feel, he can take care of it. I mean- He did feel palpitations. If those measures were not sufficient, that's starting to sound like malpractice, which doesn't really get you anywhere. But except, Your Honor, that that's not the only evidence that is in this record. So besides the consistently elevated blood pressure, as defendants themselves described it at the time, there is also evidence in the depositions and that's at JA660, 661, and again JA914 that defendants themselves recognized that if there's no lifestyle changes that improve elevated blood pressure, medication becomes the treatment that has to be administered. I don't want to sound irreverent, but what lifestyle changes can he make when he's in prison? For example, as he already had done and that showed at 473, he was on a no-salt diet. So that's one of the examples of lifestyle changes that could be done. And it was done in this case, and it was already in place at the time the EKG was done. So if it was done, then it's hard to complain that it was not. Well, except that defendants themselves recognized that if those lifestyle changes do not improve the elevated blood pressure, and this happened for a period of seven months, then after a certain period of time, if there is nothing else that is non-medication treatment that could improve that blood pressure, then medication becomes the treatment. So really what we're talking about is, at the subjective prime, is the failure to provide his blood pressure was going to continue to be elevated at a potentially dangerous level. Correct. And that eventually led, as the doctors at the hospital found when he had the stroke, to a stroke. So counsel, I hear you saying repeatedly that over a course of time, with certain elevations in blood pressure, and if lifestyle changes don't work, then some medication should be prescribed. And then I think what you just said is looking retrospectively from the stroke, we can say perhaps there should have been an intervention earlier. But what do we look to in the record to know that the standard of care wasn't met at a time when he had the stroke, and what should have been done earlier? Because as non-medical professionals, we can't just look at this record and say, aha, clearly it wasn't met.    I think that's a good point. Your Honor, I would point you to two things. First, as you were noting, we're not suggesting that it's a hindsight analysis from what happened at the time of the stroke, but all we're saying is that the blood pressure readings at that time were consistent with the ones that were recorded over the prior seven months. The 160, for example. At the time he had a stroke, it was 142 over 78. That was when he was admitted at the hospital, and that's a J464, 465. And at that time, the doctors, too, said that was a concern, and that the stroke was due to hypertension. But going to the standard of care, the defendants themselves at J660, 661, and 914 set out the standard of care in their deposition. They say that if there's no decrease in elevated blood pressure, and if there are other symptoms as there were in this case, headaches, palpitations, and the lifestyle changes do not improve the elevated blood pressure, then medication is the treatment. But there's still a temporal question. How long do you wait and monitor? How long do you see if lifestyle changes make the effect? How long do you see if blood pressure goes up or down? And at that point, any doctor looking at this would say, you've got to intervene differently. How do we know that that moment was hit here? I would like to note that this court has held that in Section 1983 cases, the inquiry is not really one that is focused on what would the medical community do in those circumstances, because that would sound in malpractice. This wouldn't make out a malpractice claim, right? We're not talking about malpractice because we weren't trying to prove that, so we never offered an expert testimony as to what the objective community would do in these circumstances, because the question is not whether an external doctor would do, in hindsight, given these factors. The question is what the defendants knew or should have done at the time, given the symptoms that they were seeing. What medical expert testified or provided evidence on behalf of your client? There was no expert, Your Honor. Help me through this. How then are we to evaluate it? These numbers sound pretty high to me. It sounds like if I had hypertension and my doctor knew it and didn't provide me with adequate medication, I'd have a problem with that, but that's not where we are exactly. So tell me, on summary judgment, how are we to assess whether this fell below a standard of care that qualifies then as a form of deliberative indifference? I would point the Court to the Athaway decision that we cite in our briefs. In that case, this Court expressly recognized that while the defendants argued that an expert was required precisely for the reasons that Your Honor is voicing here, this Court held that it has, quote, never required plaintiffs to allege... But there are some instances in which you don't need an expert. A lay jury could look... In the malpractice context, it's typically like a sponge gets left at a patient by a surgeon. You don't need a medical expert to tell you that that falls below a reasonable standard of care. It's not the case that there aren't allegations of subpar medical... that given the overall nature of the allegations,  to be able to assess whether they fell below. So that case, I don't think, supports the proposition that you don't need a medical expert in this case. So I think, back to Judge Lillia's question, what would we look at to assess that what occurred here fell below that? So, if I may, on the first part of your question, Your Honor, I actually think that Athaway is probably a very closer call case than this case, and the reason is the following. In that case, the plaintiff declined to undergo surgery, and then over a period of multiple months, he complained of pain due to his condition to his hip to the doctors, and the doctors prescribed painkillers, and they monitored it, and they took notes, just like in this case, and after a point in time, this court found... There, the doctors knew that there was some kind of device that was malfunctioning or something like that. And that was one of the... Sounds kind of like the example I gave. Except that the court found two reasons why there was deliberate indifference in that case. One was what Your Honor just noted, that the doctor knew that there was an issue with the screws in his hip, and that they didn't disclose it to the patient, but separately, in the very next paragraph of that opinion, the court noted that where a patient continues to complain of symptoms, and where the doctors keep receiving those complaints and does some minimal amount of treatment, after a certain point in time, where the patient continues to go to the infirmary to complain of the same symptoms, and the doctor knows that what they're doing is not making things any better, at some point, if the doctor knows these two pieces of information, then they should have done something more, because they knew that what they were doing was not making any difference. Your Honor, you were referring to headaches, palpitations, the doctors knew of this? They knew of those symptoms, and they also noted... Because he told them? When there was an interpreter with him, and that is a separate part of the deliberate indifference claim here, is that not only defendants did not provide adequate treatment, but denied treatment entirely. But you just said that an interpreter was provided. It wasn't provided, Your Honor. What happened in this case, according to the evidence, is that if there was another inmate in the infirmary that also happened to be on sick call, and that inmate happened to speak both Spanish and English, then Rodriguez would ask them to help him communicate with the doctors. But he testified in his deposition, and again in the declaration, that when there was no inmate there, he wasn't provided an interpreter by the prison. Did he ask for an interpreter? He did. He said that when he went there, and he couldn't communicate, they didn't provide him one. That says he went there, he couldn't communicate, and they didn't provide. My question is, did he ask for an interpreter? According to his deposition, he did, but also according to the medical defendants, what the standard routine was in those cases would be if an inmate showed up and said things like, no habla, or he obviously doesn't speak English, so he can't have a meaningful conversation. We have a doctor who said he had a meaningful conversation with him. Or conversation, at any rate. So few conversations are really meaningful. But that's a dispute of factor, Your Honor. This is why we're on summary judgment. That's exactly the problem here, is that the district court ignored the disputes of fact in the record that cut across the three claims. Where would I look in the record to find his request for an interpreter? So I would point, Your Honors, to JA-280, around those pages. That's his deposition testimony. And I would also point, Your Honors, to the medical defendants' own testimony at JA-420-662-856. Where they all... You're arguing this as a sort of stand-alone contention of deliberate difference, not in conjunction with the medical information? Because it seems to me it kind of leads to the same set of questions, at least, that I had. Which is, what did he attempt to say that they didn't understand that would have made a difference that any doctor operating under a reasonable standard of care would have said, oh, with that information, a different course of medical treatment would have obviously been required. So at JA-280, what he explained is that on those occasions, he was also going to complain of extreme headaches and palpitations. And we contend, given the remaining evidence in the record, if his blood pressure had been taken, the inference would be that it would be consistent with the pattern of blood pressures during that period of time. So I think maybe for me it would be helpful to understand if this got to a jury, because this is, I think, a helpful way to frame it, what would be the story that he would tell with whatever evidence is already deemed to be admissible at the summary judgment stage that a jury could reasonably rely on? I think it would be a three-step inference, Your Honor. And it would be everything in his favor at the jury trial. Right. So the first step would be that there are medical records at the time these events went down where the medical defendants noted that his blood pressure was elevated, that he had palpitations, that he had headaches. So defendants knew of those symptoms at the time. The next step would be that defendants knew, as they testified in their deposition, of the proper course of treatment where there are multiple symptoms. As they noted, those are more concerning than just one out-of-line blood pressure or one complaint of headache. And so they knew that when those symptoms are presented over a period of time and lifestyle modifications that were already performed in this case do not make the symptoms any better because Cordegas continues to complain about them, then the next step would be that because they knew of the symptoms, they knew of the proper treatment, and they didn't provide it, then they declined for whatever reason to... So where does the language barrier come in? Why is that part of the story? Part of the story... Sorry for misreading your earlier question, Your Honor. The interpreter... No, you didn't misread it. I'm just asking another question. The interpreter bit would fit in because Mr. Rodriguez was both trying to communicate additional symptoms that would have made it even more obvious for the medical defendants that he was experiencing concerning symptoms. And on top of that, it's a question of subjective knowledge at this point and for deliberate indifference. So the question becomes whether a medical doctor that is presented with a patient with whom they cannot communicate, with whom they cannot have a meaningful conversation besides through an inmate who's not a licensed interpreter. So at that point, they knew that they were not able to get a full diagnosis, they were not able to understand the treatment, the symptoms that he was complaining about, and then we would end up in the same type of scenario that the Fourth Circuit dealt with in the higher case where what the court found is that there was no need to show that some specific harm befell on the plaintiff because of the failure to provide an interpreter. It's just that it's obvious to anyone who's communicating with a person who doesn't speak their language. In answer to Judge Jacobs' question, you pointed us to some parts of the record where he asked for an interpreter and they understand and they have a protocol pursuant to which they should provide an interpreter when it's obvious that someone can't communicate their medical needs or concerns. Yes, where they recognize that would be J420, 662, and 856 where the medical defendants state that they do not speak Spanish and that what they do when a Spanish speaking inmate or another foreign-born inmate appears before them and doesn't speak English, their practice is to tell them to wait and they would find an interpreter. What Mr. Rodriguez has testified to is that that interpreter never came. You do acknowledge that there's this tension in your argument because on the one hand the doctors didn't do what they should have done given all the information that they had from him about his symptoms and on the other hand that he was deprived of the opportunity meaningfully and effectively to communicate those symptoms to the doctors. I don't think that is a tension your honor for the following reason what it simply shows is that sometimes because of happenstance because an inmate was present he was able to communicate the symptoms that he was experiencing. That would mean that the lack of an interpreter had a diminished consequence and you haven't really identified that the consequence that's attributable to their not being a licensed Respectfully your honor there is no requirement for a consequence here. What the Supreme Court has held in Farmer and what the Fourth Circuit case in Hire makes clear is that when the risk of the substantial risk of harm is obvious as in Hire the failure to provide an interpreter in Farmer having a transgender inmate in an all male facility where the risk is obvious Estelle doesn't require an actual harm. Is the upshot of that Fourth Circuit decision that at any moment that the medical staff is faced with an inmate who speaks a language that they don't have an interpreter on hand or inmates at that moment a deliberating difference claim has been born? I don't think so your honor because there is still the objective component of the analysis which is very important. We're just talking because that is the only issue in this case whether or not the defendants were subjectively deliberately indifferent but there still has to be a threshold finding that the medical concern that was in the case is an objectively serious one and that's conceded in this case. There is no dispute among the parties that there was an objectively serious issue Let's take any other case in which objectively had the communication been possible of any particular symptom Yes. So that's true but in that moment the staff doesn't have on hand an interpreter either a professional interpreter or a medical or an inmate who can assist that's a deliberate indifference claim. I don't think that this court has to draw the line quite there for this reason because in this case and I don't mean to fight your hypothetical I'll answer this at the second And then you'll come back to not fighting peacefully answering But the line doesn't have to be drawn in this case because we have evidence of specific complaints that the plaintiff meant to disclose during those visits and we have evidence that the failure to provide an interpreter was not a one off occasion but it was a persistent event. So going back to your hypothetical if it was just one instance in which an interpreter wasn't provided and there was no evidence that the inmate meant to disclose anything other than I have a paper cut because I was going through my papers in my cell and there is assuming that otherwise he has some serious medical underlying condition then I think that would be a much closer question because it would be a one incident where an interpreter wasn't provided where there was no evidence that there was any medical complaint at issue and so I think that that's a very close Yes? As we like to say, kept you well past your time Thank you You've reserved some time for rebuttal If I may Yes You'll have some time to address those Thank you, your honor Good morning, your honors and may it please the court, Sarah Rosenbluth for Appellees Plaintiff's condition, of course is an unfortunate one and the reason for that, your honor is based on a fundamental premise that is unsupported by the record and that fundamental premise which I heard Mr. Godey say is that the medical staff kept receiving complaints and plaintiff kept going to the infirmary and complaining of the same symptoms that is not supported by the record When plaintiff did present with symptoms on May 20th to the nurse's station the nurse scheduled him for a medical appointment and he was seen on May 25th by Dr. Andola who is a defendant in this action He did have slightly elevated blood pressure on that day and he did have certain other symptoms which is why Dr. Andola properly took a number of follow-up steps She ordered an EKG, which was normal. She ordered lab work which was normal, including the cholesterol levels which can be an indicator of stroke and she issued him a weekly blood pressure card. Plaintiff, Mr. Godey's highest blood pressure was recorded at 149 over 86. Now I want to emphasize... Yeah, that was well before the period... I don't think that's during the relevant period of time So 149 over 86, which was recorded on October 13th Plaintiff was seen by Nurse Blovelt on that day. She is not a defendant in this action and I think that sort of speaks to a general theme that I've noticed from Mr. Godey's presentation and his brief, which is just sort of this reference to defendants, defendants, defendants in this group sort of sense but this is a 1983 action against individuals in their individual capacity and we don't have any evidence of what any individual did that fell below a constitutional that was constitutionally inadequate You mean individual defendant Yes, sorry, that's what I meant and that also goes to the interpreter point because we don't have any evidence whatsoever that any specific named defendant here ever denied a request and that fundamentally distinguishes this case What about those pages that your adversary listed? 420 662 856 Yeah, that was not I can check... Those pages presumably would show that he made a request and it might show to whom I don't believe it does, Your Honor There's no evidence that so that 662 is actually a citation to the deposition transcript of Dr. Guzman Dr. Guzman did not testify that he received a request for an interpreter that was denied and so there's and plaintiff Is there any record of a request for an interpreter that was granted? There's no record one way or another on that All we have is Mr. Rodriguez's testimony that quote many times he felt that he needed one Does he not testify that he never got an interpreter after asking for an interpreter? No, he never testified that he asked for one I'm happy to refer to a specific page of the record I'm quite sure that there's no testimony that he ever asked for an interpreter and did not get one and so that really fundamentally distinguishes this case from a case like Hire where the plaintiff was deaf and the prison obviously knew that he was deaf and they actually went so far as to assign him an inmate companion who admittedly did not know ASL so what they did just was not helpful at all and then there are two Judge Nathan's point too about the consequences in that case there was specific evidence that the plaintiff did not understand the doctor's instructions regarding how to fill his prescriptions and how to take his medication and therefore went without medication that is not the claim here and so again I also just want to focus on I do presume that standard medical practice to take symptoms from a patient so at some point the inability to communicate would be an obvious detriment to the doctor that they're not able to treat the person if they can't understand what the complainant said absolutely but the record here is that there were specific symptoms that were communicated on various occasions and again it wasn't really always this so the headaches and the occasional palpitations were properly communicated at the May 20th and 25th appointments and that's when the EKG was ordered and the blood book was ordered. On follow up occasions on July 28th and 29th and also October 13th the July 28th and 29th are dates when Dr. Guzman saw a plaintiff and then August 2nd and August 13th are dates when Nurse Bloveld saw a plaintiff who Nurse Bloveld is not a defendant in this action but there were specific complaints made at the July 29th appointment for example. He complained of moderate lower back pain. He was, and Dr. Guzman therefore ordered an x-ray which came back normal. There is really a documented record here of him making specific requests and receiving the requested treatment. So for example on August 2nd he came back to us and said I was supposed to get a back brace for my back and I didn't get one so they said okay here's your back brace. He requested a pumice bar for his calluses and received it. What does this have to do with the stroke? Nothing and that's sort of my point. He was making complaints that were documented. It's not to the patient to say all of these things add up to a risk of stroke and I need, can I have medical intervention. That can't be the way to look at it. That's right and certainly it can't be the way to look at it. The other point I want to make here is that plaintiff has limited his argument on appeals that the relevant time period is the seven months from July 2011 to February 2012 when he suffered the stroke and that's at page 22 of their brief. They specifically hone in on that seven month period and they say that defendants did nothing. Plaintiff did not make any complaints of stroke symptoms or warning signs during that seven month period and was not even seen by three of the four defendants. So it can't be that an individual is constitutionally in, provides constitutionally inadequate care when the patient... But he was seen by one of the defendants in that period. That's right. Was that for high nail or was that for... No, so on July 28th he reviewed, he met with Dr. Guzman to review the lab work that was ordered in May and that was normal. And again, his heart rate was noted as regular rate and rhythm. That was 130 over 80. That's correct. Oh, his heart rate, yes, and his blood pressure was, again, within normal limits. July 29th, the next day, his blood pressure was 140 over 82. I also want to focus this court's attention on a document that is in the record that I did not cite in my brief, which is the docs primary care hypertension practice guidelines which starts at page 449 of the record. And there's a helpful chart at page 456 of the record that kind of breaks down the normal ranges of blood pressure and the appropriate interventions, if any. These numbers are elevated. They're slightly elevated, yes, but that document, again, says that a diagnosis of hypertension should be made based on an average of two readings that are taken after the first screening. And so if we say that the first screening was on May 20th when he had slightly elevated blood pressure at 144 over 88, the average of the following three visits when he was seen by named defendants in this action is 138 over 85. And that chart corroborates Dr. Gusman's testimony that that is not... It's higher than normal, not hypertension. That's right. That's right. 148 over... So the average at the following three visits was 138 over 85. And so... And the other important part here is that the record is clear as to what sort of the range of possible... When you say the record is clear, do you mean that it's undisputed? Yes. So what I mean to say specifically is that it's undisputed what other risk factors for stroke are, and it's also undisputed that plaintiff did not have those risk factors. That is admitted by him at page 592 of the record. And so, for example, those things include things like a family history of cardiovascular disease, being diabetic, being a smoker, being a menopausal woman, not engaging in any exercise. And plaintiff did not have any of those risk factors. And Dr. Gusman testified at page 495 of the record that, you know, in light of the totality of the circumstances, that one factor of slightly elevated blood pressure, which really was still within the normal realm, was not a cause for additional medical intervention, nor did it cause his stroke. And that testimony is also not disputed? Right. I mean... Is that correct? Yeah. I mean, plaintiff... I don't think so. I mean, it's definitely not the case that plaintiff has presented evidence to call into question Dr. Gusman's testimony as to what an appropriate medical intervention... Well, there's no medical... Look, I understand that I asked your friend on the other side about medical experts in support of his position, and there are none. But there might be testimony from him? Is that what you're suggesting? There's no test... From anyone that suggests that a doctor should have done anything differently under the facts presented? You're dealing with the numbers, which are certainly irrelevant, but... And you've listed other factors, but among the factors would be other symptoms that suggest hypertension and risk of stroke, such as palpitations and headaches and stuff like that, and there really is no objective way of determining whether they're having palpitations. So the question then becomes whether he communicated that and whether he was able to communicate that to doctors who then should have, in light of whatever these numbers show, have anticipated that it was an emergency to do more. Right, and there's really... Yes, and I'll say that the evidence does show that on at least two occasions, he was able to sufficiently communicate that he did have occasional heart palpitations, but no chest pain and no dizziness, and on those occasions is exactly when Dr. Andola ordered a panoply of further testing. Was he afforded a licensed translator for any of these encounters with the medical staff? That is not in the record one way or another, Your Honor. Is it in the record that he asked for that? It is not. What is in the record is that Nurse Anthony spoke some Spanish. That's cited in our brief. Dr. Guzman felt that he was able to communicate with plaintiffs, and Dr. Andola, there's no evidence one way or another as to her Spanish capacity. That being said, she's the one who really did the most here in terms of ordering all the tests and giving him the blood pressure card and so forth. So we don't know whether any of the doctors understood Spanish? We know that Dr. Guzman did not. That's right, but we know that Dr. Guzman, we have Dr. Guzman's testimony for what Right, that's right. But he felt that he could communicate with plaintiffs, and I just really want to emphasize here that we don't have any testimony from plaintiffs or anyone that plaintiffs made specific requests that were denied, or even that there was objective factors at specific medical visits that were ignored, suggesting a lack of communication. We just have very general testimony from plaintiff himself saying many times, quote, many times I couldn't communicate, but we know that he was seen by a number of people, many of whom are not even defendants in this action. And so it just, there's just no evidence that the specific defendant ever  I'd like to ask a question about the retaliation claim. Sure. I think the argument seems to be premised on the temporal proximity, you focus on the filing of the complaint, and the other side focuses on the meeting with pro bono counsel, sort of one factor, and then the other factor is this, the plaintiff's testimony about the statement from a guard saying you're the one seeking money. The timeline for the transfer request, was that before or after the plaintiff started meeting with pro bono counsel? So I don't know when plaintiff started meeting with pro bono counsel. You know, that's not, that timeline is not exactly in the record, and plaintiff, I believe, Mr. Cody can speak to that, but the timeline, so what we, all we know about, so we have plaintiff's own testimony that a correction officer came up to him one day and said, oh, you're the one who wants money from the state. You know, we'll take that for what it is, there's no corroboration of that, but... Not a great fact. Sure, but... An inference is available that the guards in the community are aware of the lawsuit. So that inference is available, but I'll make two responsive points. One is that there's no evidence in the record whatsoever about when that interaction took place. We have his allegation in his two months before his transfer, so that would have been around May of 2016. That's an allegation and it was not covered in his deposition, and there's just no evidence about when that happened. And second, there's even if there's an inference that the COs knew of this, there's really no basis on which to impute that knowledge to the two defendants here. One of whom... Specifically disclaimed. That's right. That's right. Both in their... There's nothing in the record that I saw at least that disputed the disclaimer. That's right. That's right. And let's take a step back and understand why it totally makes sense that they would not have had knowledge of this lawsuit. One, because Defendant McGlynn worked in Doc's central office in Albany, which was not the facility, which was about 90 miles away. I mean, Doc's, you know, is a pretty big bureaucracy. There's a lot of staff. There's really no reason why this individual in Albany should have been aware of something from the facility. And, you know, the truth of the matter is that there's any number of incarcerated individuals suing the state for damages at any given time. So it's not, unfortunately, not really a unique fact to plaintiff here. Well, that doesn't matter. What matters is whether lots of them are or not. This allegation was that a guard in the community was aware of this lawsuit. And so I think at least the inference is available that Demchik, who's in the same facility, would have heard that information, refuting the deposition testimony that they had. I think in the face of her sworn testimony that she was not aware of the lawsuit, there's not... It's too tenuous an inference to be reasonable for a jury to rely on. Yes, that's right. And, again, this case is very different from the Espinal case, for example, where that knowledge was imputed because plaintiff had previously sued a CO named Serber, I believe, and then subsequently was assaulted by some staff, including Serber and someone else named Frasher. And the court said, yes, Serber obviously knew of his previous lawsuit because he was a named defendant and Frasher wasn't, but he worked on the same team as Serber. So it's a reasonable inference that they would have chatted about it. There's nothing to that effect here. We don't know who this... He says this person's name was Sullivan, and I accept that, of course, but we don't know whether Sullivan and Demchik ever spoke, ever socialized, ever really worked the same shifts. We don't know anything to that effect, and so given that we do have sworn testimony saying that she did not know of the lawsuit, there's really no basis to undermine that here. So is it really the rule at Franklin that inmates are limited to one 30-minute phone call a month? That was the directive at the time, at least, that was... Was that for everybody or just for this... No, it was enforced across the board, and I will say, too, that... I'm not sure that makes it all that better. I mean, here the allegation is that it shouldn't have been enforced across the board, right? That this plaintiff, because he couldn't communicate in writing as a result of the stroke, should have been provided an additional phone call. Yeah, no, and that makes a lot of sense. However, the policy itself at page... I can't find it... 219 of the record actually makes... It does say this is the policy unless there's a court order to the contrary or unless there's specific written direction from DOC's Office of Counsel. To say unless there's a do much for... No, but my point is that it says... So leave aside the court order, but my main point is that it says unless there's direction from DOC's Office of Counsel to the contrary. So it does make allowance for counsel... Yes, but it's the Office of Counsel that an order from a judge would be communicated. No, I think it's... I think you could read the policy, and it does say that basically attorneys can reach out to DOC's Counsel's Office to request an exemption. And there's no evidence that... And there might have been good reasons for an exemption to be granted here, but... Evidence that an attorney made that request. That's right. And we do have in the record... How would a lawyer know that that's an option? Because it says so in the policy, and all along we're... The defendants, you know, were enforcing Directive No. 4423, and, you know, they could have gone to that policy and reached out to DOC's Counsel's Office. Or is there evidence... I mean, sometimes defense... Plaintiffs' attorneys or defense attorneys make efforts to call or contact or set up a call, whatever the standard operating procedure is. Is there any evidence in the record that there were efforts to go beyond that that were denied? No. No. There's evidence in the record basically starting around page 117 of all counsel's emails and letters to the facility scheduling phone calls, and they... What happened was they would routinely propose a set of times, and basically I think on almost every occasion they were accommodated. There is one time that they do cite that it was abruptly canceled due to I think an incident in the facility, but that is unfortunately the nature of things sometimes when we're dealing with a prison. And so... And were in-person visits ongoing, or were they not? At the time, I believe so. It was pre-COVID. And... Right. They could have had... It was... In northern New York it is true, but there were still available on in-person visits. And so... Yeah. I mean, I'll just conclude by saying that there's really no question of fact here as to whether any defendant ignored a known warning sign. There's no question of fact as to whether any defendant took... Had acted with any retaliatory animus. And there's no question of fact as to whether his access to the courts was impeded by this phone policy. Thank you very much. Thank you. We'll do a rebuttal. Thank you, Your Honors. If I may make a couple of points. I know you have questions on the remaining claims, but I wanted to respond directly at a couple of arguments that my friend on the other side made. So... To address them all with one point that I would like to make clear is that defendants continue to ask that inference be drawn in their favor, that the evidence be read in their favor. And they also ask this Court to find that the evidence is not really strong for plaintiff. But all of those inferences, all of those findings are not for a court to make. Those are for the jury to make. I think she, just to be fair to your friend, I think she is saying that several of the key facts are not disputed. Well, it's not about strength. There is nothing on the other side that disputes some of the... points that she made. So could I point you to a couple of things that... So, for instance, they say that the blood pressure was slightly elevated. It was upper limit. It was almost normal. Well, at the time, at JA 473, for example, defendants did not say it was upper limit. They didn't say it was slightly elevated. They said it was elevated. At the time the stroke happened, the blood pressure was at the same level. The doctors then too said it was a concern. It was hypertension. That doesn't... Even accepting those characterizations, I mean, what the numbers were is undisputed. Accepting your characterizations I think still leads to the question of given the overall set of things that we see  conclude from this deliberate indifference to the reasonable standard of care? I would point your honors again to the defendant's own depositions where they recognize that repeatedly elevated blood pressure readings over a period of time where lifestyle changes do not make it better require more than just monitoring. To move on to another example of disputed... Before you do that, 592, undisputed that all of these other potential factors were normal. Well, your honors, for example palpitations and fibrillation. Palpitations is a subjective symptom of atrial fibrillation. Extreme headaches are a sign of potential stroke risk. Those are also complaints that were both made in the record, but more importantly were complaints that Rodriguez meant to bring to the defendant's attention had they provided an interpreter to him. At J280 expressly says that and I wanted to go back to this point about whether or not he expressly requested an interpreter or what exactly the testimony is there. So the testimony is that he would go to the infirmary. At times he was able to communicate because there was an inmate and at other times the infirmary was empty and he would be denied treatment. And at those times he was complaining about extreme headaches and palpitations. I wanted to make clear there is no evidence that he says I requested an interpreter on this occasion. He says I would go there. No one was there to help and I would be denied treatment. And defendants themselves in their depositions, those were the other page I flagged for 2856, there for example nurse Antony, my colleague on the other side mentioned that she spoke some words of Spanish. In her own deposition she says at 420 that she didn't speak Spanish. Dr. Guzman didn't speak Spanish. Dr. Ando didn't speak Spanish. And they testified that because they didn't speak Spanish, what they would do is ask the inmate to wait and they would get an interpreter. What Jose Rodriguez is testifying here is that when that happened, when he was asked to wait because they would get an interpreter, no one was made available and would be denied treatment. On another related point on the interpreter, I think whether or not Rodriguez expressly testified that he requested an interpreter on a particular occasion is a bit of a red herring because it's not it is obvious in certain circumstances that for example when an inmate doesn't speak English that an interpreter is needed. There are certain circumstances where deliberate indifference is still met and that's what the Supreme Court held in Farmer where there has been no express statement or notice given by the plaintiff to the defendants but the situation is so obvious that an inference can be drawn at summary judgment and again that's where we are at this posture. Moving on to the other claims just in terms of and I see that I'm already running up of time but on the policy specifically for the telephone calls, that is in the record as the state mentioned, that was requested during discovery because it wasn't publicly available so that was produced during discovery but there is no evidence in the record that it was available or that it was provided to council. So council was presumably operating on the assumption that any time they wished to set up a call they could get a call and those efforts failed, that's in the record? So yes, they initially tried to set up calls as frequently as it was happening in the prior facility in New York where apparently the policy was not enforced and they tried to set up calls and they were informed that only one call every 30 days can be scheduled. Where is that in the record? I don't have the citation in front of me I apologize. Okay, so they're informed of the policy. There is a part of the record where the email exchanges between council and the prison are recorded and so those show that initially they tried to set up a call more frequently, they were told that it was once every 30 days and then since then they did it every once, they kept setting them up through email and at times they were abruptly cancelled even within less than 10 minutes from the scheduled call. Council said one time? One time in the record where it was cancelled. Again, the time period in which we're talking about is less than a year so that says 11 calls I believe are the ones that were made and the page is JA. Is that policy still in effect? It's not in the record. If I have to be... Presumably you communicate. I have... Because it's not publicly available I have no way of knowing that. I understand. But my understanding is that it may have been at least amended if not withdrawn but the state will be the one that would be in the best position to answer that. I'm afraid I don't have the information because it's not publicly available. The page for the email exchanges... Sorry. We missed. Go ahead. The page is JA 1131 and I wanted to make another point on the retaliation claim and again answer any questions that you may have but whether or not it was known by more than Officer Sullivan that my client was engaged in protected conduct again that's an inference that this court drew in Espinal. It's true that in that case one of the guards on the squad was also a defendant in a prior lawsuit but this court did not ground its holding on that fact alone. It said that it was a legitimate inference in summary judgment to draw that either the other defendants that weren't involved in the lawsuit learned of the lawsuit from the guard that was a defendant or that... I'm sympathetic to some of the arguments but don't we usually require some admissible evidence? I don't know that there are reasonable inferences to be made from the evidence in summary judgment and then there's sheer speculation. How do I distinguish between what you're saying? How do I determine that what you're saying is sheer speculation or a reasonable inference? Well I think that the first answer I would give is that this court in Espinal found that that speculation was permissible but well very different... scenario in Espinal. Because one of the members of the squad was... Yes. Your theory is that once one person knows it, that knowledge is inferable to every employee in DOCS. Well no every officer at the facility would know if it's known among officers at that facility but again in Espinal it wasn't the holding. Even on that... It's imputed to everybody. You don't get to McGlynn on that theory. Except that McGlynn was in contact telephone contact as it's shown in the transfer documents with Demchik at the facility where Rodriguez was held. So inferences to Demchik because of Sullivan and inference to McGlynn because there's evidence that McGlynn and Demchik had conversations but that's the evidence you have on your side if those are reasonable inferences and on the other side they both deny knowledge and so the question is is that sufficient of a dispute to go to a jury? I don't think that's the only evidence here. There is also evidence as plaintiff testified at J 316 that everyone knew that Franklin was where trouble inmates would be sent if they had trouble with the officers, if they had trouble with the administration or with other inmates so again it's you know there is... It's a lower security facility but they send the bad inmates there? Well for example the record shows that the phone policy was not enforced in the maximum security facility where Rodriguez was initially but it was enforced in Franklin. So there are differences that don't just go to the maximum or medium security facility Can I ask you the timeline question? Yes, I have that. I think your temporal proximity argument is premised on you all start or your colleagues start meeting you know the fancy lawyers come in and pretty soon after that the transfer. I have it that the transfer request was generated and this is 173 April 20 of 2016 and I don't see anything about I mean I think it's not clear but that lawyers begin in person meetings in May 2016 which is after that date Right. The testimony is that you know as your honor pointed out that's page 130 our representation of Ms. Rodriguez started in April and the meeting started in May and June again the process... The transfer request happens April 20 2016? My understanding is... I don't have the page in front of me but my understanding is that that's when the declassification of security... No, no, that's April 7th at A173 What is the transfer request? That's the question. Right. So the transfer process is started with the declassification then there you know there was various discretionary decisions made throughout the process leading up to the transfer request at that point... And when is the transfer request? I don't have the page still in front of me but I think your honor was mentioning it was in April of 2016 but at that point then McGlynn had a choice as she testified between various facilities in the state some were less remote than the one that she chose even though she testified that although she didn't plan a route she determined that Franklin was the one that was closest travel time to the facility of origin. No, she said she looked at a map and it looked the closest and I think the record is if you compute the travel time one is closer and one is farther is that right? They're all about the same distance I think that's in terms of travel time. So if you look at a map it may appear closer even if travel time is the same. Well it depends again what McGlynn testified she didn't plan a route. She also testified to travel time. If we are drawing an inference in her favor that travel time meant car then yes driving time would be the same but she testified to travel time and  with vehicles other than a private car would be significantly longer to get to Franklin than to either of the other facilities and it also happened to be that Franklin was as I mentioned for example not only the one where troubled inmates would be sent but the one where the phone policy was strictly enforced unlike in the prior facility. And again unless there are any further questions Just is there evidence on that point that Demchik or McGlynn knew which facilities enforced the directive? There's no directly that they knew that that that that facility out of the others enforced this policy that wasn't publicly available. The transfer went through in July so eventually you know it's the process started around the time that representation changed but then it was finalized after the meetings had already started to take place and so I would like to ask this court to vacate and remand because on this record it was not a question for the court whether or not the jury would find in plaintiff's favor or in defendant's favor but simply whether or not disputes of fact require the jury to be the one making this finding. Thank you. Thank you very much. Very helpful. We'll reserve decision. We'll hear argument next in UPS Supply Chain Solutions. The next item on the agenda Airways Corporation 212867. Please be seated. Please the court Mark Estrella of countrymen and McDaniel on behalf of appellant UPS Supply Chain Solutions. The lower court here erred in ruling on a rule 12b6 motion to dismiss for lack of personal jurisdiction. This is subject to a de novo review. What appellant is seeking here your honors is guidance. Guidance in the sense that there's a lower court decision that seemed to play a heavy hand in terms of shaping the views of not only this court but also other courts in the country with regards to the impact and effect of the Montreal Convention on the issue of personal jurisdiction. You're talking about the Royal Sun case? That's correct your honor. Which relies on Whitaker which is a binding second circuit decision. That's correct your honor except for the fact that that issue was not fully briefed as stated in the court's own opinion and I was on that case your honor in terms of there was no briefing on Montreal Convention the court precluded that and yet commented on it. The language of Whitaker is clear on this point whether it's analyzed or not or briefed or not it's it's site of original injury. That's correct your honor. Now in this case your honor we're not basing our complete argument on personal jurisdiction coming directly from Montreal Convention. What we're arguing is that it has an impact in the specific personal jurisdiction analysis that's being utilized for purposes of supporting jurisdiction in this case. In this case  jurisdiction being asserted there is specific personal jurisdiction being asserted under the New York Long Arm Statute specifically 302 A3 1 or 2 and the assertion is that the application of that statute needs to follow the line of cases or needs to be distinguished from a line of cases that applies to airline personal passenger personal injury or in those cases there's a situs of injury test that's the purpose of that test     to to to to to to to to to     to to to to to to to to to to